**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL QUINN NASSRY**<br>158 W. Ridge Lane<br>Warriors Mark, PA 16877, | : <br> : <br> : | CIVIL ACTION |
| Plaintiff, | : <br> : | |
| v. | : <br> : | NO. 4:23-CV-00148 |
| **THE PENNSYLVANIA STATE UNIVERSITY**<br>The Pennsylvania State University<br>201 Old Main<br>University Park, PA 16802, | : <br> : <br> : <br> : | **JURY TRIAL DEMANDED** |
| and | : | |
| **NICHOLAS P. JONES**<br>Executive Vice President and Provost<br>The Pennsylvania State University<br>201 Old Main<br>University Park, PA 16802, | : <br> : <br> : <br> : <br> : | |
| and | : <br> : | |
| **LEE KUMP**<br>Dean, College of Earth and Mineral Sciences<br>510B Penn State Innovation Hub<br>123 South Burrows Street<br>State College, PA 16801, | : <br> : <br> : <br> : <br> : | |
| and | : <br> : | |
| **CYNTHIA BREWER**<br>Department of Geography<br>302 Walker Building<br>The Pennsylvania State University<br>University Park, PA 16802 | : <br> : <br> : <br> : <br> : | |

|                          |     |
|--------------------------|-----|
| and                      | :   |
|                          | :   |
|                          | :   |
| **DENICE WARDROP**       | :   |
| Chesapeake Research Consortium | : |
| 645 Contees Wharf Road   | :   |
| Edgewater, MD 21037      | :   |
|                          | :   |
| Defendants               | :   |

### PLAINTIFF MICHAEL NASSRY'S BRIEF IN RESPONSE
### TO DEFENDANTS' MOTION TO DISMISS

Plaintiff Michael Quinn Nassry ("Dr. Nassry" or "Professor Nassry"), by and through his attorney, Law Office of Arthur D. Goldman, LLC, responds to the 12(b)(6) Motion of Defendants The Pennsylvania State University ("Penn State", "University" or "Defendant"), Nicholas P. Jones ("Provost Jones"),  Lee Kump ("Dean Kump"), Cynthia Brewer ("Dr. Brewer"), and Denice Wardrop ("Dr. Wardrop"), Sarah Chamberlain as follows:

**I.**     **INTRODUCTION**

Despite Defendants' attempt to disparage Professor Nassry's allegations as "rambling" and "unintelligent," quite to the contrary, the facts pled provide a comprehensive, cohesive and complete recitation of the abuse Professsor Nassry endured from certain colleagues, as well as the Pennsylvania State University's (the "University") failure to address these known issues through the lack of enforcement of their own rules and internal policies.  The failure to address issues Dr. Nassry made known to the University enabled and perpetuated damaging behavior from certain colleagues that persists to this day.

Prior to 2015 – the date when the abusive behavior from colleagues began – Professor Nassry really had been living his dream life.  As a graduate of the undergraduate program from The Pennsylvania State University he was thrilled to return to his alma mater in a capacity that

2

would allow him to continue his research and teach a subject that he loves. It would be unreasonable to think he would abandon his dream job the moment a problem arose, because it is not feasible to think a healthy employment relationship could continue in the midst of a lawsuit from an employee against the employer. Thus, Professor Nassry sought to resolve these legitimate, abusive problems he experienced from colleagues on his own with his employer through the channels the employer already had in place to supposedly resolve such issues.

In fact, Professor Nassry displayed model behavior because he did not run straight to the court or agency for relief right after the abusive behavior arose, instead opting to try and resolve the issues on his own, directly. This is commendable because it is the process that ought to be followed instead of automatically and initially relying on legal intervention for the resolution of employment problems. It would be overwhelming if all individuals with employment grievances, either from fellow employees or the employer, would immediately run to federal/state employment agencies and then the court system to seek redress for damages.

Professor Nassry should not be penalized for his patience and trust of his alma mater for taking the time to try and resolve the issues outside of the internal processes to which he had access. Professor Nassry only engaged legal representation and sought recourse through the EEOC, and then the court system, once it became abundantly clear the University was not going to address the issues and the detrimental impact it was continuing to have on his life. Because Professor Nassry believed in the University, an institution he loved, so strongly, he wanted gave it an ample chance to make things right and resolve these issues so he could continue living the life and in the job that he loved so much.

Generally, this brief will address the two main issues Defendants argue warrant the dismissal of the Complaint followed by the other smaller issues.  First, all timing issues shall be addressed to demonstrate that Plaintiff's claims are not time-barred.  Second, the brief will highlight the causal nexus established in the Amended Compliant between actions by the Defendants and the damages to Professor Nassry.  Lastly, the brief will respond to argument that no public policy exists that lacks a statutory remedy to support a wrongful termination claim.

## II.   <u>QUESTIONS PRESENTED</u>

1.  Does the legal concept of equitable tolling that is recognized in Pennsylvania and Federal courts defeat Defendants' claim that Plaintiff did not initiate a charge with the EEOC within the 300-day time limit?

    (Suggested Answer: **YES**)

2.  Does the legal concept of equitable tolling that is recognized in Pennsylvania and Federal courts defeat Defendants' claim that Plaintiff did not initiate a charge with the PHRC within the 180-day time limit?

    (Suggested Answer: **YES**)

3.  Does the legal concept of equitable tolling that is recognized in Pennsylvania and Federal courts defeat Defendants' claim that Plaintiff did not initiate a charge within the 180-day statute of limitations for retaliation claims under the Pennsylvania Whistleblower Law?

    (Suggested Answer: **Yes**)

4.  Does the Amended Complaint contain sufficient facts to establish that individual defendants were in supervisory roles relative to the Plaintiff and such individual defendants aided and abetted discriminatory acts against the Plaintiff, thus establishing liability under the PHRA?

4

(Suggested Answer: **YES**)

5. Does the Amended Complaint contain sufficient facts to establish a causal nexus between Plaintiff's reports of waste and misuse of funds and retaliatory acts perpetrated against him, either explicitly or implicitly, by Defendants to establish liability under the Pennsylvania Whistleblower Law?

(Suggested Answer: **YES**)

6. Does a public policy exist without a statutory remedy that supports Plaintiff's claim for wrongful termination in violation of public policy?

(Suggested Answer: **YES**)

## III.  **GENERAL FACTS**

The following is a concise statement of the background facts of the case. Defendants' Motion deals mostly with legal, not factual arguments, so specific relevant facts will be discussed appropriately in the legal arguments below.

Dr. Nassry was hired by the University on May 6, 2013, with the title of Postdoctoral Scholar. ¶19. Dr. Nassry earned his B.S. and M.S degrees from the Penn State Department of Agricultural and Biological Engineering prior to working as an environmental and human health risk assessment professional for a private consulting firm then earned his Ph.D. from Virginia Tech modeling glacier meltwater hydrology and carbon chemistry using stable water isotopes and carbon fingerprinting in Southeast Alaska. ¶20-21. During his employment in the Riparia research center in the Penn State Department of Geography, Dr. Nassry served as the hydrology subject matter expert for all major research grants in the center, taught undergraduate classes for the College of Earth and Mineral Sciences and the College of Agriculture, advised 6 minors, and was

twice awarded the College of Earth and Mineral Sciences CAUSE grant where he led a year-long course that included student research and travel components in Peru and Alaska. ¶22.

This case involves incidents of sexual harassment related to the unwanted romantic advances from an older female co-worker, Sarah Chamberlain, which began in 2015 and escalated through 2018 when Dr. Nassry first caught her disparaging him at a professional conference. ¶23. This case also involves incidents of gender-related discriminated in the form of plagiarism related to Denice Wardrop and her former grad student publishing Dr. Nassry's work dating back several years, but of which he became aware of the behavior in the spring of 2017. ¶26.   Retaliation and threats relating to his reporting of these incidents began in the spring of 2019 and continued through 2022, after Dr. Nassry reported the initial discriminatory actions. ¶27. In addition, this case involves incidents of the Plaintiff's whistle-blowing about the misuse of department funds and the retaliation against him for doing so. ¶28. These incidents were not only tolerated by Defendant Penn State and its administration, but were ratified by it and resulted in retaliation against the Plaintiff. ¶29.

Prior to his resignation on the last calendar day of 2021, Dr. Nassry attempted to resolve the issues described herein by first reporting them to his direct supervisor, and then reporting his concerns of harassment, plagiarism, threats, retaliation, potential misuse of funds, and a hostile work environment to several recommended Penn State offices including the Penn State Office of Research Protections, the Penn State Affirmative Action Office, the Penn State Office of Ethics and Compliance, as well as individuals including the College of Earth and Mineral Sciences Ombudsperson, Geography Department Head, and Research Center Director. ¶31.

When Denice Wardrop became the Director of Riparia and his direct supervisor in July 2018, Dr. Nassry was retaliated against by being moved off funded projects, assigned large

amounts of unpaid administrative/service work, excluded from new funded projects without explanation or notification, and isolated from connections with collaborators inside and outside Penn State. ¶44. After Dr. Nassry's repeated attempts to have the above issues addressed, Denice Wardrop threatened him on multiple occasions, isolated him from research projects, and suggested she would block him from a job opportunity by volunteering to be on the hiring committee after he was selected as a finalist. ¶45. Denice Wardrop repeatedly claimed the College of Earth and Mineral Sciences Dean Lee Kump and Geography Department Head Cindy Brewer were her friends and "on her side." ¶46.

Because of the threats by Denice Wardrop, the isolation from research projects, the continued publication of the Plaintiff's uncredited work by Denice Wardrop and her former student, and the harassment from Sarah Chamberlain, Dr. Nassry had no alternative but to resign from his full-time faculty position at Penn State. ¶47. This has caused Plaintiff stress impacting his health, damaged his career, and had a significant negative financial impact. ¶48.

## IV.   **LEGAL ARGUMENT**

### A.   **Standard of Review**

Federal Rule of Civil Procedure 12(b)(6) authorizes the Court to dismiss a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. See Fed. R. Civ. P. 16(b)(6). In considering whether to grant Defendants' motion to dismiss pursuant to Rule 12(b)(6), the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F. 3d 361, 374 n.7 (3d Cir. 2002)). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer

evidence to support the claims." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000) (quotation and citation omitted). The defendant bears the burden of establishing that the plaintiff's complaint fails to state a claim. *Gould Elecs. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000).

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The statement required by Rule 8(a)(2) "must give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 955, 167 L. Ed. 2d 929 (2007).

The Court should not grant a defendant's motion to dismiss if the plaintiff is able to plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009). (citation omitted). As such, in the complaint, plaintiff must plead sufficient factual allegations "'to raise a reasonable expectation that discovery will reveal evidence of'" each necessary element. *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine where they plausibly give rise to an entitlement to relief." Id. at 664.

The inquiry in determining the sufficiency of a complaint is "normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating

whether all of the elements identified in part one of the inquiry are sufficiently alleged." <u>Malleus v. George,</u> 641 F.3d 560, 563 (3d Cir. 2011).

At such an early stage of the litigation process, before discovery, and with notice pleading, Plaintiff has more than met the standard to defeat Defendants' motion. If at a later state of the proceedings, if the Defendants' see fit, they are certainly welcome to file a motion for summary judgment.

**B. Questions 1, 2 and 3 – The Legal Concept of Equitable Tolling Defeats Defendants' argument that Plaintiff's claims under Title VII, the PHRA and the Pennsylvania Whistleblower Law are Time Barred.**

For the purpose of efficiency, responses to all of the time-barred arguments made by Defendants will be responded to in this section. Equitable Tolling is a well-established concept in the law and applied with equal effect in both Pennsylvania state and Federal Courts.

> While a legislature's power to establish or alter a statute of limitations is well recognized, where statutory time limitations are not jurisdictional, principles of equitable tolling have been employed to ameliorate the harshness of limitation periods. Equitable tolling permits administrative agencies and courts to postpone application of statutory limitations for a period of time in certain appropriate circumstances. Indeed, it is hornbook law that limitations periods are "customarily subject to 'equitable tolling,'" *Irwin v. Department of Veterans Affairs, 498 U.S. 89, 95, 111 S. Ct. 453, 112 L. Ed. 2d (1990)*, unless doing so would be "inconsistent with the text of the relevant statute," *United States v. Beggerly, 524 U.S. 38, 48, 118 S. Ct. 1862, 141 L. Ed. 2d 32 (1998)*.
> *Nicole B. v. Sch. Dist. Of Phila.*, 237 A.3d 986, 994 (Pa. 2020).

The question before this Court for each right Professor Nassry seeks to enforce – rights under Title VII, the PHRA and the Pennsylvania Whistleblower Law – starts with whether the statute of limitations is or is not jurisdictional. If it is not jurisdictional, then the second question is do the facts of the case demonstrate that equitable tolling is appropriate. If the facts pled in the Amended Complaint establish a sufficient basis for the Court to apply the principle of equitable

tolling, then Plaintiff's claims may stand and not be dismissed due to a matter of being untimely filed.

Before turning to the meat of the argument it most be noted that even were this Court to find some of the earlier facts not actionable, they are nonetheless critical for a deeper understanding of the case as they actually took place and give context to the later occurring acts.

We will analyze the rights asserted by Plaintiff in a slightly different sequence than the order addressed by Defendants, discussing the PHRA first instead of Title VII.

### *1.  PHRA*

In *Nicole*, the Supreme Court of Pennsylvania examined whether "principles of equitable tolling found in the *Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 962(e)"* applied "to an otherwise untimely complaint." *Nicole* at 988. The *Nicole* Court did not address the question of whether or not the requirement under the PHRA for filing an administrative complaint be made within 180 days after an alleged act of discrimination (43 P.S. § 959(h)) is 'jurisdictional' or not. Because the Court proceeded with its analysis of whether the facts warranted equitable tolling of the 180-day deadline, it appears the Court concluded without addressing the issue of whether this particular statute of limitation is jurisdictional.

In *Nicole*, the plaintiff was a mother of a minor who at the time of the offending behavior was eight years old. The minor was physically and verbally harassed at school for two months, leading up to a sexual assault. *See Nicole* at 988-989. The mother and the minor both reported the harassment to the minor's teacher and school administrators, however, no action was taken on the part of the defendants. The mother eventually withdrew her son from the elementary school. Two years later, the mother filed an administrative complaint with the Pennsylvania

10

Human Relations Commission (PHRC) on behalf of her son and in her individual capacity. *Id.* at 989. The PHRC ultimately rejected the complaint as untimely.

The mother then filed a complaint in the Philadelphia Court of Common Pleas, asserting the same PHRA-based discrimination claim. *Id.* After the conclusion of the trial, the Defendant in *Nicole* moved for the entry of a compulsory nonsuit, arguing the "trial court lacked jurisdiction over [the mother's] PHRA-based claims because she failed to timely file her administrative complaint." *Id.* The trial court granted the Defendant's motion, concluding that "neither the PHRA's equitable tolling provision contained in *Section 962(e)*, nor the Minority Tolling Statute, applied to Appellant's administrative complaint." *Id.* The Plaintiff-Mother appealed to the Commonwealth Court.

The Commonwealth Court eventually ruled against the Appellant-Mother and for the Appellee-School District. The Pennsylvania Supreme Court "granted allowance of appeal to consider whether the PHRA's equitable tolling provision or the Minority Tolling Statute applies to an untimely complaint filed by a minor's parent with the Human Relations Commission." *Id.* at 991. The Supreme Court's ruling was based solely on the PHRA's equitable tolling question and the other issues were not addressed.

The Supreme Court's analysis of equitable tolling for the PHRA found that Act addressed this principle in both broad and specific terms. *Id.* at 994-95. In Section 959 of the PHRA, subsections (a) and (j) speak broadly to the Commission's duty to reject a complaint that is untimely when there are "**no grounds for equitable tolling**...." *Id.* at 995 . (emphasis added). The Court found the PHRA uses more specific terms in Section 962(e), "allowing for the tolling of statutory time limitations...." *Id*

The Court's analysis concluded that because the Pennsylvania legislature had not specifically defined the phrase "equitable tolling," it was, under the Statutory Construction Act, to look for "common and approved usage" of the phrase. *See id*, citing 1 Pa.C.S. §1903(a). The Court recognized that "equitable tolling is ... a malleable, policy-driven concept taking into account principles of justice and fairness for both the party who seeks delay of the running of the limitations period and the party who is protected by the statues of limitations." *Id*. The Court noted that "[e]quitable tolling has evolved as an 'umbrella' concept." *See id.*, citing *David v. Hall, 318 F.3d 343, 345-46 (1st Cir. 2003)*.

Perhaps most relevant to the matter at hand, the *Nicole* Court cited *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1387 (3rd Cir. 1994) that equitable tolling is a wide-ranging doctrine that "encompasses three, non-exclusive, situations":

> We preface our analysis of the equitable tolling doctrine with the observation that the time limitations set forth in Title VII are not jurisdictional. *See Hart v. J.T. Baker Chemical Co., 598 F.2d 829, 831 (3d Cir. 1979)*. These time limitations are analogous to a statute of limitations and are, therefore, subject to equitable modifications such as tolling. *Id*. Such treatment of Title VII's time limitation provisions **is in keeping with our goal of interpretating humanitarian legislation <u>in a humane and commonsensical manner so as to prevent unnecessarily harsh results in particular cases.</u>** *Id.*
> ***
> We have instructed that there are three principal, <u>though not exclusive</u>, situations in which equitable tolling may be appropriate: (1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum.

(emphasis added)

The *Nicole* Court further analyzed how wide to open the umbrella concept of equitable tolling under the PHRA. The Court found "the phrase 'equitable tolling,' as used in the PHRA, is "not explicit, and, therefore, is ambiguous." *See Nicole* at 997.

Thus, the Court used the statutory construction factors enumerated in Section 1921(c) of the Statutory Construction Act to determine what the Pennsylvania Generally Assembly intended that phrase to mean within the PHRA.  The Court focused on the "necessity for the statute," the "mischief to be remedied," and "the object to be attained." *Id.* at 998, citing 1 Pa.C.S. §§ 1921(c)(1), (3), (4).  The Court found the PHRA's object was to "eliminate various forms of discriminatory practices in employment … based on race, color, familial status, religious creed, ancestry, handicap or disability, age, sex, national origin, and the use of a guide or support animal." *Id.*, citing 43 P.S. § 952.  Further, they found that equitable tolling under the PHRA "is to be employed in a manner consistent with the purposes of the statute." *Id.*  Lastly, and perhaps most importantly, the Court noted the PHRA was to "be construed liberally for the accomplishment of the purposes thereof" and that "statutes 'shall be liberally construed to effect their objects and to promote justice'." *Id.* at 999, citing 43 P.S. § 962(a) and 1 Pa.C.S. §1928(c).  The preceding analysis led the *Nicole* Court to find the Pennsylvania General Assembly wanted equitable tolling to be liberally construed to reasonably allow for an increased amount of social justice in order to address various forms of discriminatory practices in employment.

Professor Nassry did not run to the PHRC as soon as problems arose with the Defendants.  He attempted to resolve the issues on his own using the existing channels established at the University.  *See* ¶¶ 27, 31, 32, 41, 62, 63, 75, 77, 88, 94-96, 98-110.  Shortly after it became apparent the University was not going to properly address his complaints (¶¶ 105-110), Professor Nassry sought legal counsel to understand his rights.  Professor Nassry then proceeded to act swiftly and file complaints with the EEOC and

13

PHRC. *See* ¶¶ 6-7. It should be commendable that Professor Nassry attempted to resolve the issues on his own using employer-created channels and not to seek redress immediately through administrative and legal routes, for if every employee would, at the first indication of problems covered by Title VII and/or PHRA, file complaints with the EEOC and/or PHRC, it is not hard to imagine these agencies would be overwhelmed.

Even without liberally construing the doctrine of equitable tolling under the PHRA, a fair reading of the facts in the Amended Complaint would lead this Court to find it appropriate to not time-bar Professor Nassry's claims. Liberally construing equitable tolling under the PHRA presents gives this Court even more latitude to allow Professor Nassry's claims to not be time-barred.

### 2.   *Title VII*

As discussed in the preceding sub-section, equitable tolling is a principle recognized in Federal Courts and utilized in a wide range of situations – that is, the 'umbrella' of equitable tolling stretches wide to include Title VII cases.

In the *Oshiver* case, *supra*, the Third Circuit described the concept of equitable tolling as a tool to achieve the goal of "interpretating humanitarian legislation <u>in a humane and commonsensical manner so as to prevent unnecessarily harsh results in particular cases." *See* Oshiver at 1387. The *Oshiver* court first dispensed with the question of whether or not the Title VII time limitation was jurisdictional by concluding it was not. *Id.* Next, the Court went about applying the equitable tolling doctrine in light of its overarching goal.</u>

The *Oshiver* Court described three **non-exclusive** categories in which equitable tolling may apply: "(1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been

14

prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." *Id.*  While the three principal non-exclusive situations may not, on their face, be perfect representations of equitable tolling for the case at hand, the facts pled in the Amended Complaint certainly fall within the arc of these principal situations.  The three situations enumerated generally represent instances where an aggrieved party recognized the bad acts of the offenders, wanted to assert rights afforded to them to seek redress and had a justifiable reason for not filing a complaint immediately with the EEOC/PHRC.  As discussed above, paragraphs 27, 31, 32, 41, 62, 63, 75, 77, 88, 94-96, 98-110 of the Amended Complaint describe Professor Nassry's attempts to address the problems he encountered through existing channels at the University.  He understood the bad acts of the Defendants and sought redress by means with which he was familiar.  As soon as it became clear that Defendants would not allow him to exercise his rights to their full-extent, he acted without delay to seek out legal counsel and file complaints with the appropriate administrative agency.  The sequence and timeline of events can be viewed as model behavior, because to encourage all individuals who have been problems with their employer to automatically run to administrative agencies to preserve their statutory rights does not seem to be the intent of Title VII and the PHRA.  It is much better to encourage employees to seek redress first within existing channels afforded by their employer, which is what Professor Nassry did in this case.  *See* ¶¶ 27, 31, 32, 41, 62, 63, 75, 77, 88, 94-96, 98-110.

### 3. *Pennsylvania Whistleblower Law*

There is little to no caselaw providing analysis of whether the principal of equitable tolling may and how it is used with respect to the Pennsylvania Whistleblower Law.

-Similar to the analysis under the PHRA, because the doctrine of equitable tolling is used widely among courts, and because there is little guidance from existing caselaw, this Court is encouraged to "liberally construe[]" the Whistleblower Law in order to "effect their object[]" and "promote justice."  Even applying a narrow interpretation of what it means to 'equitable toll' the 180-day period within which a claim is to be brought, the facts of the case provide a good basis for tolling the time limitation.  This Court may also find that Professor Nassry in effect preserved his claim by notifying the University and because he was still working with the University to resolve issues the time period did not end until all communication ceased in July 2022.

## C. Questions 4 and 5 – Factual Averments within the Amended Complaint Describe a Causal Nexus Between Plaintiff's Allegations and Damages Sustained by Plaintiff from the Actions of all Defendants, thus Supporting Liability under the PHRA and Pennsylvania's Whistleblower Law.

The Defendants argue in their brief that Professor Nassry failed to plead facts that establish (1) a plausible claim against the individual defendants under the PHRA and (2) a causal connection between his report of waste and wrongdoing and retaliatory conduct by defendants. Each shall be addressed in turn.

### 1. *PHRA*

Defendants' brief coyly attempts to not understand how the actions of Wardrop, Brewer, Kump and Jones could possibly fall under the provisions of the PHRA.  In the Conclusion section of the brief, Defendants mention Sarah Chamberlain in their Count II bullet-point, but we assume this was an oversight to remove this reference from their first brief as Sarah Chamberlain

16

has been removed as an individual defendant from the Amended Complaint.  In particular, Defendants seem fixated on the idea that Defendants Jones, Kump and Brewer, who were clearly Professor's superiors and/or high level administrators, could have ratified the behavior leading to Professor Nassry's constructive discharge.  In addition, Defendants seem to ignore, dismiss or not understand the connections drawn in the Amended Complaint between defendant Wardrop's actions that were enabled by defendants Jones, Kump and Brewer and the impacted that has persisted against Professor Nassry to this day, even after defendant Wardrop changed positions within the University.  This subsection will identify the factual averments made in the Amended Complaint that Defendants overlooked and how they establish the causal nexus Defendants fail to recognize.

In footnote 41 of the Defendants' Brief in Support of Motion to Dismiss Plaintiff's Amended Complaint ("Defendants' Brief"), Defendants' counsel does a good job succinctly describing the concept of constructive discharge.  As Defendants note, constructive discharge is essentially identical under Pennsylvania law and when related to "retaliation claims under federal statutes."  Constructive discharge occurs when the employer permits the environment for workers to be so unpleasant, difficult or intolerable, that a reasonable person would feel compelled to resign.  *See* FN 41, Defendants' Brief, citing *Kroen v. Bedway Sec. Agency, Inc.* 633 A.2d 628, 633-34 (Pa. Super. Ct. 1993) and *Wiest v. Tyco Electronics Corp.,* 812 F.3d 319, 331 (3d Cir. 2016).

As Defendants note, individual employees in supervisory roles, may, along with the employer, be liable under the PHRA when they "aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice.  *See* Defendants' Brief pg. 13, citing 43 P.S. § 955(e).  When looking at the named individual defendants, they were

either a direct supervisor of Professor Nassry, or a superior in the chain-of-command to his direct supervisor, all the way up to the highest administrative position in the University and thus accountable for the actions of the subordinates for whom they supervise.

Evaluating each named individual defendant, it is clear that they had a direct or indirect supervisory position relative to Professor Nassry.  First, defendant Wardrop was Professor Nassry's direct supervisor in the Riparia Research Center in the Department of Geography at Penn State's University Park campus.  *See* Amended Complaint, ¶ 17.  Defendant Wardrop was head of the Riparia Research Center and had direct control of much of Professor Nassry's academic development and career advancement.  *Id.* at ¶¶ 44-45.  Even when she was removed from her position at the head of the Riparia Research Center, she remained an employee of the University and new positions were created for her to occupy, despite altercations with the University Provost that were serious enough to warrant security needing to remove her from the Provost's office.  *Id.* at ¶ 138.  Professor Nassry was well aware, based on statements made by defendant Wardrop, that she had allies in defendants Brewer and Kump who could continue to make his working situation intolerable.  *Id.* at ¶¶ 46, 157.  Defendants Brewer and Kump were both directly in the chain-of-command from defendant Wardrop up to Defendant Jones. Defendant Brewer was the head of the Department of Geography, which oversaw the Riparia Research Center.  *Id.* at ¶ 16.  Thus, defendant Brewer was a direct supervisor of defendant Wardrop and indirectly responsible in a supervisory capacity toward Professor Nassry. Defendant Kump was the Dean of the College of Earth and Mineral Sciences ("EMS").  *Id.* at ¶ 15.  The Department of Geography was housed within EMS, thus making defendant Kump a direct supervisor of defendant Brewer and indirectly responsible in a supervisory capacity toward Professor Nassry.

Defendants Wardrop, Brewer, Kump and Jones directly and indirectly enabled an intolerable working environment to fester within the Riparia Research Center by ignoring and failing to address several legitimate issues that were made known by Professor Nassry to University officials.  Defendant Jones, as the chief academic officer at the University, seems especially culpable in allowing the intolerable working conditions to develop and persist.  It was his job to remove problem employees who created unpleasant and intolerable working conditions, especially once made aware of the problem.  And yet, despite knowing that defendant Wardrop was a problem employee on many different levels,[1] he continued to allow her to remain within the University and shuttle between positions, even creating positions for her to occupy seemingly to pacify her and hopefully sweep the problem under the rug, so to speak.  *Id.* at ¶¶ 103, 139.

Because Professor Nassry was living his dream job, he wanted to do everything in his power to stay employed with the University and researching/teaching the subject that he is passionate about.  He continued to try and use established University channels to resolve issues with his supervisors, hoping, if not to renew his ability and desire to stay employed at the University, to at least repair his reputation and bolster his academic credentials.[2]  When defendants Wardrop, Brewer, Kump and Jones, failed to take affirmative steps to address the known problems, problems that were quite serious in an academic setting, they did indeed ratify Professor Nassry's need to resign.  Professor Nassry's resignation was based on the unpleasant and intolerable situation of working for an employer who was willing to ignore complaints of

---

1 **Paragraphs 111 – 239 of the Amended Complaint provide extensive detail of the myriad of problems defendant Wardrop created at the University and the failure to hold her accountable.**
2 **Paragraphs 60-80 of the Amended Complaint provide a sample of the facts pled that detail the reputational risk defendant Wardrop allowed against Professor Nassry.**

sexual harassment, documented evidence of plagiarism, and accept that it was acceptable for waste and abuse of grant money to occur, as well as allow uncommon actions by supervisors to intentionally stifle career advancement of their subordinates. *Id.* at ¶¶ 43-45. The individual defendants "ratified" Professor Nassry's constructive termination because their lack of action gave consent to all the inappropriate actions that preceded – actions that created an intolerable working environment. That is, the named individual defendants aided and abetted the creation and persistence of intolerable working conditions. Given the culmination of all the bad acts by the named individual defendants and the knowledge that those same individuals were likely to control his career for the foreseeable future, it was very reasonable for Professor Nassry to feel compelled to resign. *Amended Complaint*, ¶¶250-260.

   *2. Title VII*

   Defendants argue the Amended Complaint fails "to set forth **any** facts establishing that [Professor Nassry] was actually forced to resign. *See* Defendants' Brief pg. 10 (emphasis added). Defendants clearly are not being honest when they suggest ZERO factual averments existed in the Amended Complaint to support a claim that Professor Nassry's working environment had been allowed to become so unpleasant and intolerable that he made the reasonable choice to resign. The Amended Complaint is very detailed in its averments as to the unpleasant conditions under which Professor Nassry operated under all the way through the time when his tenure ended with the University. There are literally dozens of averments on this issue.

   As discussed previously, the doctrine of equitable tolling permits this Court to evaluate actions prior to 300 days from the charge filing date. Defendants calculate the 300-day mark from the charge filing date as December 7, 2021 and argue that Professor Nassry is left to only allege discriminatory, harassing, or retaliatory conduct that occurs after his date in hopes that it

will sink Plaintiff's claims; however, Defendants' argument fails for two reasons.  First, this

Court has suitable basis to consider conduct prior to December 7, 2021 on the basis of equitable

tolling.   Second, the impact of Defendants' actions are still being felt.  As a result of Defendants'

actions, Professor Nassry's total compensation steadily dropped as more and more retaliation

was heaped on him and the impact of past smears against him by Defendants to his peers outside

the University diminished his ability to attain gainful work after leaving the University.  *See* ¶¶

252-256.

D. **Question 6 – The Public Policy of Academic Integrity, Especially as it relates to plagiarism, does not have a statutory remedy and supports a claim for termination in violation of public policy.**

It is absurd that Defendants, as representatives of a major nationally recognized research

University, choose to not recognize or acknowledge the importance of academic integrity,

especially as it relates to plagiarism, and the public's interest that institutions of higher learning

they fund adhere to those high standards of integrity.  No tax-paying citizen would want to be

complicit in fueling the disgrace of their publicly funded school system, yet that is what would

happen every time a citizen pays their taxes if there was no public policy recognized for

academic integrity, especially given the extremely damaging effects unchecked plagiarism

represents to an academic institution.

Defendants argue a public policy "must be expressly recognized in legislation,

administrative regulations or decisions, **or judicial decisions."** *See* Defendants' Brief, pg. 17,

citing *Eaves-Voyles v. Almost Family, Inc.,* 198 F. Supp. 3d 403, 410 (M.D. Pa. 2016).  As the

Court in *Sch. Dist. of Phila. v. Commonwealth Ass'n of Sch. Adm'rs (*2016 Phila. Ct. Com. Pl.

LEXIS 634) summarized: "it strains credulity to argue" that no public policy exists which guards

against academic dishonesty in public education; that "[p]ublic confidence in public education is

eroded when the principal of a public school turns a blind eye to such obvious cheating perpetrated by employees in her direct supervision … it is fundamental that plagiarism and cheating are antithetical to learning and education and thus contrary to established policy." *Id at *8-9.* Defendant Pennsylvania State University itself has an extensive policy about "Academic Integrity"[3] that includes within its description of "academic misconduct" examples of plagiarism. This is taken so seriously because of the devastating impact plagiarism has on the core mission of educational institutions. Every college and university, small or large, public or private, in Pennsylvania, and across the nation, has their own version of an Academic Integrity policy that includes prohibitions of plagiarism,[4] which represents the incredible importance of this issue and its importance of upholding credibility and trust in the minds of the public for the system of higher education.

Moreover, a research professor's livelihood and economic value is often in the professor's ability to generate research that is credited to them. An institution that does not follow their own guidelines to protect a researcher's intellectual property in order to safeguard their economic value certainly contributes to an unwelcome work environment that would not be tolerated by a reasonable person, let alone a gifted professor.

Beyond the field of education there exists an abundance of examples regarding individuals being reprimanded or sanctioned for plagiarism.[5] It is well established that trust in

---

3 See https://undergrad.psu.edu/aappm/G-9-academic-integrity.html; https://senate.psu.edu/policies-and-rules-for-undergraduate-students/47-00-48-00-and-49-00-grades/#49-20
4 See e.g., https://www.law.upenn.edu/students/policies/conduct-and-responsibility.php; https://www.cmu.edu/policies/student-and-student-life/academic-integrity.html; https://www.pct.edu/students/student-affairs/student-policy/academic-dishonesty-policy-and-complaint-procedure; https://www1.villanova.edu/villanova/provost/resources/student/policies/integrity.html; https://www.as.pitt.edu/faculty/policies-and-procedures/academic-integrity-code; https://www.clarion.edu/academics/student-success-center/writing-center/academic-honesty-and-plagiarism.html; https://www.ship.edu/copyright/academic_dishonesty/
5 See e.g., https://www.abajournal.com/web/article/lawyer-is-sanctioned-for-lifting-passages-from-opponents-motion-copying-was-neither-slight-nor-subtle; https://lancasteronline.com/news/local/legislative-leaders-withdraw-

public and private institutions is guarded by such institutions maintaining integrity policies that include prohibitions against plagiarism. To argue there is no public policy against upholding academic integrity, specifically protecting against plagiarism, in public education is simply not crediblee.

The next question is whether there is a statutory remedy for plagiarism in Pennsylvania that would preempt a common law wrongful termination claim. There appears to be no statutory remedy in Pennsylvania for plagiarism in publicly funded academic institutions. This suggests the Pennsylvania legislature has chosen to place handling this issue squarely in the hands of the academic institution to develop their own policies and handle the situations as they will be unique to each institution and can better handle any issues better than through the use of a blanket statutory remedy. Thus, Professor Nassry's claim passes that threshold as well. Finally, this Court must decide if the Amended Complaint included sufficient factual averments to connect Professor Nassry's reports of plagiarism and his termination. Paragraphs 111 through 239 of the Amended Complaint provide extensive detail of Professor Nassry's attempts to hold colleagues accountable for blatant plagiarism of his research and to stop misuse of funds. Professor Nassry should be commended and celebrated for seeking to uphold the values and virtues expressed in Academic Integrity policies – not forced to try and put his life back together after it was turned upside down due in large part to the retaliatory actions of colleagues allowed by his former employer.

## V.   **CONCLUSION**

---

witness-accused-of-plagiarism-in-pennsylvania-schools-fair-funding-trial/article_5457821c-891b-11ec-bc3b-4ba76e02b6e9.html; https://pennstatelaw.psu.edu/current-students/online-legal-writing-center/use-authority-and-attribution/information-consequences

Defendants' arguments against Plaintiff's Amended Complaint essentially break down into three issues: (1) that claims under Title VII, the PHRA and the Pennsylvania Whistleblower Law are time barred, (2) that a causal connection between Professor Nassry's complaints and retaliatory actions by Defendants do not exist to establish liability under the PHRA or the Pennsylvania Whistleblower Law, and (3) a public policy that has no statutory remedy does not exist to support a claim of wrongful termination.

This response brief examined the reasons why Defendants' arguments should fail on all three items above:

1) The legal doctrine of equitable tolling allows this Court to find Professor Nassry's claims under Title VII, the PHRA and the Pennsylvania Whistleblower Law are not time-barred;

2) The named individual defendants were clearly in a supervisory role, either directly or indirectly, to Professor Nassry, and enabled an unpleasant and intolerable work environment to develop. After learning of the problems that existed, Defendants chose to turn a blind eye which allowed these conditions to persist. Similarly, with respect to the Whistleblower Law, Professor Nassry's direct and indirect supervisors chose to ignore his reports of waste and misuse of public funds, which contributed to his inability to participate in gainful work and advance his career. Because Defendants ignored the problems raised, and in consideration of the totality of all other issues, Professor Nassry was compelled to resign; AND

3) There exists a public policy to uphold academic integrity, which includes prohibitions against plagiarism, that is not covered by statutory remedies in Pennsylvania. Professor Nassry's complaints of plagiarism were ignored by Defendants, which

24

contributed to creating an intolerable and unpleasant work environment that led to his forced resignation.

For the foregoing reasons, this Court has ample grounds to reject all of Defendants' Motion to Dismiss arguments. Should the Defendants choose to file a motion for summary judgment at the appropriate time, nothing precludes them from doing so.

Respectfully submitted,

ARTHUR D. GOLDMAN, ESQUIRE
By: Arthur D. Goldman, Esquire
Attorney I.D. No. 56983
Attorney for Plaintiff Michael Nassry
P.O. Box 115
Paoli, PA 19301

Dated:  May 8, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2023, Plaintiff's Brief in Response to Defendants' Motion to Dismiss has been served upon the following persons by the following means:

### VIA ELECTRONIC FILING AND FIRST CLASS MAIL

McQuaide Blasko, Inc.
John A. Snyder, Esquire
Chena L. Glenn-Hart, Esquire
Philip K. Miles, III Esquire
811 University Drive
State College, PA 16801

Arthur D. Goldman, Esquire
Atty. I.D. 56983
P.O. Box 115
Paoli, PA 19301
(484). 343-2856

May 8, 2023